Case No. 23-5285, Center for Biological Diversity Appellants v. United States Fish and Wildlife Services, ADEM. Ms. Ackland for the appellants, Mr. Anderson for the appellates. Good morning, Council. Ms. Ackland, please proceed when you're ready. Good morning, Your Honors. May it please the Court, my name is Christine Ackland on behalf of the Appellant Center for Biological Diversity. Before I get to the merits of this case, I'd like to first address the threshold questions of standing. In regards to this Court's specific questions on whether or not Center members have to allege plans to observe the beetle in the Southern Plains Analysis Area in order to establish standing here, the government concedes that the answer to that question is no. As our brief explains, Mr. Bugley's concrete plans to observe the beetle in the New England Analysis Area is sufficient. And that's because under this Court's case law, as long as he can allege an injury from the downlifting decision, the Center can raise any legal challenge that would ultimately result in vacature of this decision and redress the injuries, which include the ones presented here. Your brief opening reply brief don't ask for vacature of the whole rule. You only ask that the 4-D rule be vacated, quote, vacated insofar as it eliminates protections for the beetle in the Southern Plains. So you're not asking for vacature of the whole rule. You're asking for vacature on the 4-D issue, not the deluxe issue. On the 4-D issue, only in the Southern Plains. And yet, I see nothing in your declarations or supplemental brief that suggests that you have a member that would be injured by the shortcomings that you allege in the Rule 4-D rule in the Southern Plains. And given that you're only asking for partial vacature here, I don't understand your argument.  Vacature helps you here. Yes. First of all, Your Honor, this Court doesn't need to address the 4-D rule if it finds in favor of the plaintiff. I just want to focus on standing on the 4-D rule. Well, Your Honor, first of all, our complaint asks for vacature of the entire 4-D rule, and we continue to seek that. In the brief on appeal, both opening and reply brief have the exact same conclusion. And you're only asking from this Court, whatever you ask in your complaint, the only thing you're asking from this Court is vacature of the 4-D rule as applied to the Southern Plains and Alaska area. Yes. To that point, Your Honor. I mean, if I'm wrong to think that you're bound by your brief, let me know, but I assume you meant what you said. So this Court has held that when a party alleges a concrete injury from an agency rule, it has standing to challenge any essential component of that rule. You have to have standing for each form of relief requested. The party has to have standing for each form of relief requested. Correct. And so, I'm sorry to keep repeating myself, but back to the relief that's requested in your briefs. Yes. Do you have standing for that, or does your standing as to the 4-D rule depend upon obtaining vacature of the entire rule, including 4-D protections everywhere? So, what I'm hearing, just to clarify, what I'm hearing this Court ask is whether or not Mr. Bugbee, because Mr. Bugbee or none of our declarations establish that we're injured by the 4-D rule specific to the Southern Plains, whether or not that... The only 4-D argument in your brief, may. Correct, Your Honor. The answer to that question, I think, is no. Because, again... No, you don't have standing for that. This is separate from whether you have standing for the delisting. Right. I'm only focused on... Right. I think, Your Honor, that the Center does have standing in terms of the 4-D rule for the Southern Plains because of this concept that as long as we allege an injury from it... From what? From the 4-D rule. So, I think... Okay. So, Your Honor, Mr. Bugbee is harmed by the 4-D rule. You're completely divorced from the things pressed and the relief sought as long as there's some sort of generic injury, but you're not seeking relief for 4-D injuries anywhere. So, the connection here is that Mr. Bugbee has an injury from Beatles in the New England analysis area. And because that injury... From the delisting. From the downlisting. Because the downlisting reduces protections to American-bearing Beatles in New England. And because of that injury, that is enough to show vacature of that entire 4-D rule under this Court's President, D.R. Clubbee Ferguson. And we'd have to vacate the 4-D rule nationwide, across all the analysis areas. We couldn't just vacate in the Southern Plains area. Yes. So, you have no arguments in your brief for vacature anywhere but the Southern Plains area. We certainly have the authority to vacate in part rule. And that's all we've been asked to do. Right. That's where I'm getting confused here. I think, Your Honor, you can still vacate the entire 4-D rule. But is that as a result of a fighting in your favor on the downlisting? No. The downlisting... The 4-D rule follows from the downlisting. There's no 4-D rule unless there's a downlisting. Correct. And I understand you to be arguing that there, as to standing, there's harm from the 4-D rule in New England, regardless of your arguments or your requests on the 4-D rule. And the harm in New England flows from the downlisting. So, you have standing to contest the downlisting. And if you prevail on the downlisting, then the 4-D rule is vacated in its entirety. No, Your Honor. We have standing for both the 4-D rule and the downlisting. You're right in that... Wait, wait. You said no. But do you... Oh. I was agreeing with you that you have standing on the downlisting.  Yes. So, your answer would be yes on that one.  Yes. And on the 4-D rule, do you even need standing on the 4-D rule if you have standing on the downlisting? Well, if this court only addresses the 4-D rule, I think... Then we rule against you on downlisting. For downlisting, yes. How about let's just assume you didn't bring a downlisting claim. Okay. So, I think it would be possible just to bring a claim under the 4-D rule. Yes. So, if we just assume that. Okay. You only have a 4-D claim, and then your claim for relief is that you want the 4-D rule to be vacated insofar as it eliminates protections for the Beatle in the Southern claims. Yes. But then the support for the challenge is the one that you have, which is targeted at Block Island. Yes. And would you have standing to challenge the 4-D rule if that's the only thing that's at issue? Does that answer the question, at least? Yes. My answer is the same, because he's alleging an injury from the downlisting rule. And as long as he can adequately allege an injury, the plaintiff can raise any legal challenge that ultimately results in vacature of that 4-D rule, because that would redress his injury. And I see your point, Your Honor, that we only ask for vacature of the Southern claims analysis area. As to your 4-D challenge? As to the 4-D challenge. Our complaint does not, and we just seek that remedy still here. So what is the injury to your client from the 4-D rule in New England? Yes. So the injury from the downlisting rule is that by downlisting the decision— Let's assume there's no downlisting issue. Thank you. We got it. Okay. The 4-D rule provides less protections against take than the species would have if it was endangered. And we presented an array of ways in which that is true. Perhaps the most obvious is that there's a reduction in those take protections. So the 4-D rule only allows take if it occurs in suitable habitat and as a result of soil disturbing activities. So in contrast, when you compare that to an endangered listing, New England beetles were receiving a blanket prohibition against take, and now that loosening of protections on that very small population of Bering beetles on Black Island, Black Island, which is the population that Mr. Bugbee is interested in, that population is 200 to 1,000 individuals. So take— Is Black Island suitable habitat or unsuitable habitat? Your Honor, it is unclear. So the government— If it were suitable habitat, then this change in take that doesn't apply to suitable habitat would have no effect on Black Island. Right. Don't we need to know that? Yes. Yes, Your Honor. So the reason why this 4-D rule doesn't adequately protect suitable habitat is because as the government concedes, landowners have the discretion to determine whether or not their land is suitable habitat. And contrary to what the government argues, there is no requirement in the act that requires landowners to consult with the service to ensure that their actions comply with this. And also, there's no requirement— Even if they're listed as an endangered species as well? Your Honor— If they are consulting, there could be incidental take happening nonetheless. Right. But, Your Honor, by replacing this clear prohibition against take, regardless of where or how that occurred, and replacing it with this amorphous rule decreases or increases the likelihood of take. So, as an example, a landowner who knows American Bering beetles exist on their land under this rule can now effectively destroy that land if there's a plausible belief that he or she doesn't have suitable habitat on that land. And so the government presents this definition— And they wouldn't be able to do that. The beetle is still listed as endangered. Correct. And so— They'd have a duty to consult? No, they wouldn't have a duty to consult. But the service and citizens could more easily bring Section 9 claims because there isn't this amorphous definition, which even the most well-intentioned landowners— Why can't a Section 9 claim be brought for violation of 4D rules? For violation of this 4D rule, it'd be particularly difficult because, again, the definition that the service presents is that suitable habitat— You have to show that it's suitable habitat. Yes, and that is very hard. That would be very easy for landowners to show that they didn't realize their land is suitable. Well, it has to be suitable habitat and as a result of soil disturbance. Exactly. And isn't there a concession even in the rule that some minimal level of take could occur incidental to ranching and grazing? That's exactly true. So then this is a concession that there may be fewer beetles for Mr. Busby to observe. Ranching and grazing on Block—I know nothing about Block Island. This is just a factual question. Is there ranching and grazing? Is the area where he's going have a lot of private land ownership? I just don't know anything about Block Island. Yes, Your Honor. The majority of the land on Block Island is—I can't say a majority. A lot of the island is private with ranching and grazing, yes, JA133. And yes, to your question, Judge Pan. Regardless, the rule says that there could be minimal level of take incidental to ranching and grazing. So that seems to me a concession that there's going to be some more take. And if there's more take, there's fewer beetles and Mr. Busby can be harmed. Exactly, Your Honor. And that's particularly true here, again, because the population could be as low as 200. So any level of take will impact his ability to observe the beetle. Sorry, where on 133 does—Block Island? So I might—so the—at 133. I assume it's the second to third column. That's what they're talking about, Block Island. You're going to have to apply a fine. And I might have to get the exact site on Rebuttal, Your Honor. It might also be at 135. Okay. That's fine. You can go ahead with your argument. Okay. So, yes, Judge Pan, the concession that there is a level of take that will occur on all ranching and grazing is enough to show that Mr. Busby does have an injury and his plans to observe an American Bering beetle, which is enough to establish standing for the 4D rule. Because, again, under this court's precedent, as long as he could allege an injury from any portion of that 4D rule, if our arguments result in vacature of that 4D rule— But even if we don't agree with you on the 4D rule, if he is injured by the 4D rule, and the 4D rule is the result, direct result of the downlisting— Absolutely. You would have injury from the downlisting. So you could have standing to contest the downlisting, but no standing to contest the 4D rule. Yes, Your Honor. You can— Based on your concession on the 4D rule that you're only seeking to vacate the Southern Plains aspect of the 4D rule, you might not have standing on the 4D rule. But because you're harmed by the 4D rule and its provisions with respect to New England, where Mr. Bugbee is, you could have standing to contest the downlisting, because the downlisting caused the 4D rule, which caused the injury. Yes. We— But I would argue that— Vacature of the downlisting vacates the whole 4D rule. Exactly. That is true. I see my time is up. Unless this court would like me to address any questions on the merits? I think it would be helpful to just pin some of this down. 133 says about 2,000 acres of suitable habitat on Block Island. Much of it has protections that are based on easements. This would not be changed by the 4D rule. And then on 135, it says a large percent of landmass in the New England analysis area is protected in some form. So I'm trying to understand concretely. If we have a record before us, it allows us to determine that the particular 4D changes in the New England area, which haven't even been argued to us, or at least there's a showing here. And this is a question for review, so you have to sort of show it at the summary judgment level. Right. Standard here. And that's the issue, Your Honor, is that these factual challenges were never presented by the government in the lower court or at litigation here. And so if they had, the Center could have put forth additional factual information. But they— Didn't occur in this devastating. Right. And the government didn't contest in our summary judgment briefing our contention that our declarations did so. Had they done so, we could have presented additional factual support. And if this court is unsatisfied with the argument here, we're happy to provide a reply to the government's supplemental brief. There's no further questions at this time. Okay. We'll give you some time for rebuttal. Anderson. Good morning, Your Honors. May it please the court, Christopher Anderson for the Fish and Wildlife Service. On standing with respect to the 4D rule, I think the simplest way to look at this is, as Judge Mouet said, CBD has not asked for vacatur of any aspect of the 4D rule other than the restrictions in the Southern Plains area. They're bound by that in their briefs. Therefore, any injury to Mr. Bugbee on Block Island is not redressable by an order of this court vacating the 4D rule. Therefore, they don't have standing. We also would say, you know, actually, for the first time this morning, has CBD clearly articulated some injury to Mr. Bugbee from the 4D rule? And the allegation being that because the 4D rule restricts the prohibition on instant uptake to some extent, it harms his interest in observing the beetle on Block Island. I have a couple of issues with CBD's statement on that point. First, we do not concede that landowners have the discretion to determine what suitable habitat is. That's a decision that is made by the Fish and Wildlife Service in an enforcement action or a court in a Section 9 proceeding. It is never the case under the Endangered Species Act that a landowner is obligated to get some sort of preclearance before acting. The Take Prohibitions and Endangered Species Act are self-executing, and landowners who proceed without consulting the service do so at their own risk of serious liability. So, we don't see any issue there with the 4D rule limiting protections for the beetle on Block Island. The other point that I would make is while it is— Is it on standing for 4D? 4D, but this point is also going to go to standing for downlisting. So, why don't we focus on that? Yeah, so one of the points that CBD makes is that the service conceded that exempting incidental take from ranching and grazing activities would probably result in some minimal additional level of take, but they left out the other part of the service's rationale, which is exempting ranching and grazing activities is likely to preserve ranching and grazing activity on Block Island, which will benefit the beetle by providing additional habitat. And that's particularly— Isn't that in the long run? Like, immediately, there will be fewer beetles, and that's a harm. I don't think— In the long run, they'll repopulate because the beneficial ranching and grazing made that better, but in the short term, there's a harm. No, I don't think that's right, Your Honor, because I think the service's rationale is about maintaining the current status quo on Block Island. Block Island has about 2,000 acres of suitable beetle habitat. The service found that grazing areas are a suitable habitat on Block Island. That's a JA-420. The main threat to the beetle on Block Island, unlike in the Southern Plains, is not climate change but urban development. Block Island is a popular tourist destination. There's enormous pressure on these farms to make themselves available for development for tourist housing, which is not suitable beetle habitat. By reducing the burdens on the owners of these farms, it helps to encourage them to maintain their farming activities and maintain additional habitat, which is— That doesn't address my question, which is, isn't that in the long run? In the short term, there's a concession that there will be more take. In the long run, the service is saying, that's okay, because in the long run, ranching and grazing will help. But in the short term, there's injury to Mr. Bugbee if there are fewer beetles. I guess it may depend on what we mean by the short term and the long run. Beetles are an annual species, so the population levels fluctuate annually based on how much reproduction happened in the previous summer. On a given day, when a beetle might be taken because of this exemption, there would be one, two fewer beetles that day. But by maintaining the habitat, it ensures immediately, as soon as later this summer or next year, that the population of beetles will be as populous as can be in Block Island. You mentioned maintaining the status quo, but when a species is protected as endangered, the goal is not to maintain the status quo. It is to increase population to the point that you said the protections are no longer necessary, if possible. And so, by downlisting, by taking them off the endangered species list, there will be fewer beetles than there would be if they were listed as endangered. On Block Island, Your Honor? I don't think that's correct, because I think that the combination... To go beyond status quo, when they're listed on the endangered list. And you would have both the protections for grazing going on, but less land disturbance by urban development. So, I don't know how there couldn't be more. Is it an injury if it's harder, or you can't see as many as you would like to see because they're at best maintaining status quo? So, I apologize, Your Honor. I didn't mean to suggest the 4D rule was only intended to maintain the status quo. And I think the service can act to conserve and increase the population of beetle, whether it's threatened or endangered. I think what the service found when it issued the 4D rule is that the protections in that rule represent all the protections that could benefit the beetle on Block Island. And so, not only does it help to maintain the status quo, such that it isn't harming Mr. Bugbee... Is it equivalent to what they would have when listed as endangered? Or was something loosened? So, there are... The incidental take prohibition is more restricted, but the service explained why that restriction will not harm the beetle because incidental take... The service said that there, as Judge Pan pointed out, that there will be increased incidental take as a result of the down listing. The service said the beetle will be better protected if the safe ranching and grazing... There will be incidental take, right? So, this is going to happen. The service conceded there may be some incidental take, but that the beetle will be better protected by exempting ranching and grazing activities... Better protected means less incidental take? Or what is that? I'm not sure what better protected... Better protected means that the beetle will have a wider range of habitat on which to reproduce and will be more likely to survive into the future if the 4D rule was in effect and if incidental take... Is that inconsistent with more incidental take? It is not inconsistent with more incidental take, but again... So, the question, though, is Mr. Buck is interested in observing the beetle, right? That's right. I just want to focus on the... Is the fact of increased incidental take sufficient to demonstrate an injury for purposes of Article 3 from someone who's looking to see these beetles? I don't think so, Your Honor, because I think that the service's position is that there will be more beetles on Buck Island with this 4D rule than there would be with a broader incidental take prohibition. And it's... Thank you. Beetle populations fluctuate widely from year to year, so it's hard to know, but I think probably on average would be the service's position that that's the case. Can I just make sure I'm getting the upshot of that? Is the upshot of that then that the beetle's going to be better off if the downlisting happens? Yes, I believe that's the service's position on Buck Island. Endangered, it's worse off for the beetle to be endangered on Buck Island than it is to be threatened. I think that's correct based on the service's findings that the broader take prohibition actually is counterproductive to conservation of beetle habitat. But I would also make one more point on the number of beetles. It is the center's... Sorry, I can't get over this. You're saying it's better for the beetle to be threatened than endangered on Buck Island? I think what the service found is that it benefits the beetle to exempt ranching and grazing activity in general on Buck Island. The mechanism... So, yes, they're better off as a threatened species than an endangered species. Not necessarily because if they were endangered, the service could issue a programmatic incidental take permit or take other actions to exempt ranching and grazing activities. But because they're threatened, the service in its 4D rule was able to exempt ranching and grazing activities in that fashion. So if they're endangered, you can have your increased grazing through this exemption and prohibit those other incidental takes that are otherwise going to happen now that it's just listed as threatened. So the additional... No, because the only additional incidental takes that the service predicted would occur are related to ranching and grazing activities. There's urban development as well. Urban development is still prohibited by the 4D rule because of the extent that it infringes on suitable beetle habitat. That would be soil disturbing activity. Great question. So if it's... There's different ranges of suitable habitat, correct? That is correct. I believe all of the habitat that's considered suitable on Buck Island is... I forget the term that the service uses, but... Conditional or... Favorable, I think, might be the... I think the grazing habitat may be conditional. It is a bit counterintuitive since you said that even if they're listed as endangered, you could still make this exemption for grazing, ranching and grazing. So you could have your cake and eat it too, which would seem to be the maximum protection for the beetle. And what they're doing by downlisting it is getting the ranching and grazing in there. But they say in the rule there's going to be an increase in incidental take, and I'm just not... That would not happen, but for the downlist. I just don't know how we can get around that for standing purposes. So Judge Ma, I think the question is not whether for standing purposes, whether there'll be additional incidental take. I think the question is whether there'll be more or fewer beetles for Mr. Bugbee to observe. I think the service's position is that there are likely to be more beetles with the 4D rule. And I think it's CBD's burden to show that that analysis is incorrect. And they haven't even tried to make that argument. They just sort of said it's less and so therefore we win. And I don't think that it's sufficient to carry their burden for standing. Well, if there's five less... There's not that many beetles to begin with on Black Island. It's true. So if there's five or ten less... There might be five or ten less, Your Honor, but there also might be 50 or 100 more. In the long run. Not in any given point in time because of the annual nature of beetle reproduction. This is not about... So let's be clear about the timing here. There's ranching and grazing. A bunch of beetles are taken. So that's happened. And then you're saying because of the ranching and grazing, this area is going to be better suited to beetles. And so in the next cycle, there might be more. Because we're not going to have a bunch of beetles immediately born because of your ranching and grazing. So there is a time lag between the incidental take, which harms Mr. Bugbee because he's looking for beetles. There are fewer for him to see. And what you're saying will ameliorate that. That's later. I agree with that, Your Honor. But it also depends on when Mr. Bugbee plans on being there. It literally depends on the day. And I think at that level of granularity... At that granularity. Right. You're just about to say at that level of granularity. We don't... That's a standing. At that level, it doesn't have to say exactly which day and what hour. I completely agree, Your Honor. And that's why I go back to... It is burdened to show that the service's rationale... Right. He says the service has found there's going to be an increase in incidental take. The service found that there may be some minimal incidental take. There will be. It said will be. It may be. Your Honor, I don't have it in front of me. In any event, if that is sufficient, then he has standing. But, again, we don't think it is because we think that what matters is the full analysis. So you agree that he has standing if he is harmed by the 4G rule in Block Island because the 4G rule... Or standing for the D-listing. Downlisting. I agree he has standing for the downlisting if he has standing... If he's harmed by the 4G rule in Block Island. By the 4G rule in Block Island. Yes, Your Honor. Thank you. That simplifies our analysis. Yes. Yes. But, again, we don't think he has standing for either because of... But you're right. It does say may, so you're right on that one. Okay. Can we go to the merits? Yes, please, Your Honor. So I am looking at the agency rationale for this finding. And I understand that a lot of the dispute in the district court was about temporal issues, you know, whether you're in danger now versus in the foreseeable future. But what struck me as missing from the agency's analysis was what does in danger or be in danger mean? Because what I see in this record is a lot of data about zero resiliency, low resiliency, moderate resiliency. And it seems from my reading of the record that the agency is equating danger or in danger of extinction with zero resiliency because that's when we have... But there's still low resiliency in the current range, and there's really no explanation as to why low resiliency isn't also in danger of extinction. I understand it's not as imminent or as serious a risk, but it still seems to be a pretty serious imminent risk, and there's no explanation as to why that type of low resiliency doesn't qualify as in danger or of extinction. Sure, Your Honor. So a couple of points. First on the general how the service understands endangerment. The service understands to be in danger of extinction is to be on the brink of extinction, meaning that the conditions that the species faces are such that the species could go, not necessarily will go, but could go extinct in the relatively near term. But can you translate that to resiliency? Yeah. And translating that, that was going to be my second part. The only area in which resiliency is projected to be low between now and 2039 is the Red River analysis area. The other areas are currently showing moderate to high resiliency. No, I thought it was low. It's low. Right now it's zero in Red River, and it's low. It will decline between now and 2039 to low. At the time of the downlisting, the other areas were showing moderate to high resiliency. What other areas are you talking about? I'm looking at the table on JA312, and that's between 2010 and 2039. So I don't know why you're saying this is only going to happen in 2039. So that's what's expected at the end of the 2010 to 2039 period. So at the time, at the time the rule was issued in 2021. It doesn't happen on a day in December 30, 2039. No, I agree with you. I agree with you, Your Honor. It does not. It starts back in 2010, even though the rule was 2020. What was the status in 2020? In 2020, the resiliency of the beetle in most analysis areas was moderate or high. The exception, I believe, was the Red River analysis area. I don't really get moderate to high when you look across the chart. It's all low or zero. So the service expects by 2039 that resiliency will be low in the areas that's shown on that chart at JA312. Where would we like to see that? I think I understand that. Yeah. Low could be at any point in that range. And you're saying low is actually at the end of the range, which is 2039. Right. We'd like to see that at 2020, it hadn't already gotten to low. Was it moderate or high in the sub-complaint areas other than Red River? Yeah, I think. I'm sorry. It would be in the section of the species status report on current conditions. And I will have to find a page site for Your Honor for that. But just so I'm understanding it conceptually, your representation is that even though this chart says low for all of the areas, at least low for all of the areas in the southern plain. Yes. What it means is low at the end of the temporal duration covered by this category, which is 2039, not low as of the time that the order was issued. That's correct. And you're going to caption the chart's future resiliency under the time change scenario. So you have to tell me where they make that particular finding as opposed to this is the range of time. Climate change is variable. Could get worse. Could be sooner. So where do they say it's not until the very end of this range, as opposed to, say, 2030 that these things are expected to happen? Where do they say that for this chart? They don't say that because the services predictions are not made at that level of specificity. The climate change modeling is average temperatures over a 30-year time period. But if you're modeling here, if you're dealing with a risk, that is variable and could increase. It seems to me quite strange that you think that this chart is actually a prediction that everything will be a hunky-dory until 2038 or maybe January, mid-summer 2039. Your Honor, I think you misunderstand what I'm trying to say. No one is suggesting that things are going to be hunky-dory until 2039. The service expects the conditions of the beetle to decline over the next 20 years from the time the rule was issued. But the service does not believe that until 2039 or about then that conditions will decline sufficiently that they put the beetle on the brink of extinction or in danger of extinction. So I don't disagree with your Honor. I think the range is sometime in this range this is expected to happen. Otherwise, you would just say this is a prediction that it will have this status until 2039. But you have a range. And for the other things, a range. And throughout the rule, they talk about these things can happen within this time period, not an end date. So if you've got a place where they say we do not expect these chart values to be hit until the end date as opposed to within the range that's given, how can we read the chart that way? So I think... It would be very material if this could be happening in 2030 rather than 2039. It could be, but the service doesn't have information to predict that. And the service has to act on the best available science. I'm trying to pin you down on whether... If you can show me where their prediction was, notwithstanding our range here, that this will not happen. We think it's most likely or likely that it will not happen until the last year of the range. Or do they instead say within this time period, we expect it to get to this point? What they say is by the end of the time period, which could be earlier. So then that's a much more close in time risk of pretty abysmal conditions for the largest area, which is fetal as well. But the problem, I think, Your Honor, is that the service doesn't have the information to know how much closer it might be. The modeling that was done were average temperatures over 30-year time periods. And so until the end of that time period, the service can only say by the end of it. So given that they can't say that, why isn't it arbitrary and capricious that the service is saying they're not in danger now? Because the service, looking at not just temperatures, but other aspects of the beetle's life cycle and other threats to the beetle, felt that the science didn't show that it was reasonably likely that the beetle would be... But is that a standard that we can uphold, they felt it didn't show? I mean, well, it is arbitrary and capricious, is it not, to say something is not in danger of extinction because that's what we feel. Don't you have to tie that to the data which shows low resilience or zero resilience between 2010 and 2039? Why isn't low or zero resilience between 2010 to 2039 in danger or endangered now? So for purposes of listing as endangered, now is what matters. And I did find the chart I was looking for, Your Honor, it's a J413 that lists current resiliency. It's at least one place where they looked at the current resiliency. And now, now being 2021, the service found that the conditions were such that the beetle was not in danger. And the service found that at some point over the next 20 years from 2021... But that doesn't answer my question as to why is it not in danger now if its resiliency is low or zero? Because its resiliency, in 2021, its resiliency was not low or zero. In 2021, the service projected that the resiliency would decline over the following 20 years to low or zero. I'm just looking at the data that says climate change 2010 to 2039 under either moderate or high emissions, low or zero between 2010 to 2039. And why is that not in danger now? Because it's a prediction of future conditions. It's not an analysis of what the conditions were in 2021. Can I ask this? Sure. Based on 413, is the point that the last column on 413 says that as of the time that the determination was made, the 2021? Yes. Yes, that's when the final rule was. Okay. Then for the Southern Plains, you see a moderate, a high, and a low. And so you're saying that as of that time, yes, there's low for Red River, I guess. Correct. But for Flint Hills and Arkansas River, it's moderate or high. Yes, that's correct. And then it's true that on the other chart, which is at 312 and 474, it's going to become low by the end of the range. I don't know exactly what point in time it's going to transition from moderate to high to low. You're saying the Fish and Wildlife Service doesn't know exactly when that's going to happen, but the projection is that it's going to happen by the end of the range. That's correct. But as of the time the determination was made, it was moderate or high. That's correct. Can I ask you this question? Suppose it were low as of the time the determination was made. Then would you concede that if it's low at that time, then the status is endangered rather than safe? So if it were low throughout all the analysis areas or a majority of them, I think that's... Just in the Southern Plains. Just in the Southern Plains. If it were low throughout the Southern Plains, you know, I... Which is significant. I think that the Southern Plains itself qualifies as a, I forget how exactly... A significant portion of the range. The service hasn't made that finding, but we're not contesting it. 59%. We're not contesting it, Your Honor. But if it were low across the Southern Plains, at the time the determination was made, then would that be endangered as opposed to threatened under the commission's, under the service's rationale? Sure. With the caveat that I am not a scientist and it's a scientific determination, I think likely yes. Okay. So then a lot of it turns on, in your view, the difference between the time that the determination was made being moderate to high, at least to a significant part, because I think that's the overall majority of the Southern Plains, if I'm remembering right. Yes. It's like 85%, approximately. But then acknowledging that it's going to be low because the service itself predicts it's going to be low by the end of the range. Yes. Yes, which means that the beetle is likely to become endangered in the foreseeable future, which is the definition of a threatened species. And the service predicts... Next year, the foreseeable future? So proximity certainly matters, Your Honor, but we don't think that foreseeable... It could be, based on your concession, endangered next year. And there's only a five-year review period. I did not mean to concede that the service thought that it was likely... I think you said that it's likely that if the whole Southern Plain was either low to zero, that would be endangered. And you're saying you don't know when it's going to get to low to zero, but it'll be sometime within the next 17 years. So I'm saying if it's in 60 days, if it's in six months, if it's in a year, it could be by your conceitedly... It could conceitedly be endangered within the next six months or a year. No, I'm not... And there's not another review for another five years. So, Your Honor, I apologize if I misspoke. We do not concede that the data show that the average temperature over the 30-year time period... No, the concession was if it were low to zero for the entire Southern Plains, then it likely would be endangered. That concession, I will make for you. And that's what I'm talking about. I said it could be that in three months, in six months, in a year, in two. And there's not a review until five. And that's the second part that I'm not conceding, Your Honor, that the service thinks that it's reasonably possible that temperatures would increase that much over that short time period when the temperature increase was modeled over a 30-year... But we're not talking about temperature increase. We're talking about resiliency or non-resiliency. Right. But resiliency depends on the temperature increase. It does. It does. But many times in the past couple of years, we've seen articles that say, oh, it's so much worse than we thought. So, in terms of climate change. So, I'm just saying that if you concede that low to zero would be endangered and endangered could happen in a year or two or three, why is the beetle not endangered now for our purposes? So, we don't concede that low to zero could be in a year or two or three. The services position, I don't have a page type for it, but it's clear throughout the analysis in the SSA and in the preamble to the final rule, is that the conditions that would put the beetle at risk are not likely to occur until towards the end of the 30-year period. What's the basis for that? I'm sorry. Go ahead. What is the basis for that? You just said you have no idea when. If there's a finding towards the end, that would be helpful to me. It would be helpful, Your Honor, and I don't have that for you. The point is that the modeling is for average periods over time. We know temperature is going to increase more or less linearly. There will be some ups and downs. And so, to achieve the average temperatures, you need more of those high-temperature years, which are going to occur towards the end of the period. Two questions, actually, that are related. The first one is, you said you don't have it, and the it being the determination that it's more likely to happen towards the end. Are you saying you don't have it because it's not in there, or you just don't have it at the ready? I don't have it at the ready. I would have to look again. It may be in there, yes. But you don't know for sure that it is in there. I do not, Your Honor. Okay, got it. That's fine. So, what will we do in the situation in which, let's suppose, I mean, it would be really nice if scientifically it were possible to, with some reliable degree of certainty, chart exactly when certain temperatures are going to be achieved in the future. I mean, I think as a given that that's just scientifically, it would be, you know, you could try to project it, but it's not with a sufficient degree of reliability. So, let's just suppose that it's uncertain. So, the best science tells us that by 2039, the climate conditions are going to be such that it's going to be, that reliability is going to be, resiliency, sorry, is going to be low. And the best science tells us that now we haven't gotten there, that it's moderate to high. And we're not exactly sure when that's going to happen. It's going to happen at some point. And to me, I agree with Judge Pan that the five-year period seems like a reasonably significant one because that's when the automatic review happens. And if we just don't know whether it's going to transition with a degree of reliability from moderate or high to low within that cycle, then where does that leave, I mean, it's just an honest question, where does that leave the service in terms of its discretion to say, we think that's only threatened as opposed to endangered? Or we think that the possibility that it could go low by then means that we have to do endangered rather than this? So, I think that that is a hard question. And it's a question that depends on science, but also policy judgment. And so, I think it is within the service's discretion to determine whether the facts of a particular species justify a finding of endangerment now or a finding of threatened for the future. And as long as the service adequately explains how it got there from the facts that it found and the science that it has, I think that's a determination that is for the service and should be upheld by the court. Because I think the question is, is it arbitrary to say – it would be one thing to say, if there's any risk that the species becomes endangered by the next automatic review period, then it's arbitrary not to treat it, it being the species, as endangered. And is that your understanding of the way the statute works? No, I don't think the standard can be any risk. I think that the service has to think that it's reasonably likely that the endangerment will happen in the foreseeable future. I think this court's recent decision in Massachusetts Lobsterman's Association is a different context, but strongly pointed out that the ESA, the best available science requirement, does not allow the service to rely on worst case projections. And so I think for that reason, any risk wouldn't be the standard. I think you can imagine a situation in which the service had found not that endangerment's likely by 2039, but endangerment's likely by 2025. And I think at that point, the service might very well have said, now is the time. I think these are very hard judgment calls to make based on very – So then what's the best information that you can give us on the reasons that the service determined that we're not at that stage, that by the next five-year cycle, we're going to last until low, or at least we're not sufficiently at that stage, and therefore we're sufficiently assured that for now, at least – because I think I take the point that naming it threatened for now doesn't mean it's threatened for all time. It means that it could well be endangered in the next cycle. But for now, at least, we're comfortable saying it's threatened rather than endangered because there's not a sufficient degree of likelihood that we're going to cross that threshold from going from moderate to high and 85% of the area down to low. What's the best explanation or – So I think what was most important to the service is that there are a larger number of populations – not just the number of beetles, but a number of distinct populations that were known at the time of listing that those populations currently are showing – including in the southern plains – showing decent resiliency in the two more northerly areas. The catch rates recently have been pretty good in those areas for spots where the beetle is monitored. I'm sorry to interrupt. You mean pretty recently now or pretty recently around 2020? Around 2020, around basically the time of the species status assessment. And so at the time of the species status assessment, the beetle in the southern plains outside of the Red River Analysis Area appeared to be doing well. And so on that basis, the service thought that based on the projection of increased temperatures that the beetle was likely to maintain that resiliency for some number of years sufficient to allow them to monitor the situation. So to put that in context, though, when the beetle was first listed, it had lost 90% of its range. And then in 2008, when it was – the listing was reviewed, it was still found to be endangered. And at that time, they said, we have found a few more populations of beetles, but we had always thought we might. And that's not really evidence that the beetles are doing better. It's just that we didn't know about these pockets. It doesn't mean that the environmental factors, et cetera, are not still affecting the beetles in the same way. And I think I read that since 2008, they haven't found new populations of beetles within Judge Nichols' opinion. There haven't been any new ones since 2008. And it just seems to me that it was endangered in 2008. Everything that was threatening them in 2008 still exists, plus we have climate change. But now they're only threatened. So I think a couple of things on that, Your Honor. I think you are correct that no new populations have been discovered, but one experimental population has been established in Missouri, and other reintroduction efforts are ongoing in a couple of other locations. I think one thing that the service found that was important was that the new populations they had discovered had been stable since 2008. And that's led the service to conclude tentatively, to conclude that the pressures that caused the beetle to decline in the first half, two thirds of the 20th century are apparently no longer pressuring the beetle in the remaining areas where it exists. So the service is not worried, apart from climate change, that the populations that are known to exist are at risk of extinction based on the other factors, the other threats that the service knows to be applicable to the beetle. And so that's the difference, is that we've now seen those populations be stable over a period of time, which in 2008 the time had been less. And so the service feels more comfortable concluding that whatever caused the drastic decline in the 20th century, that those factors, if they're no longer an issue at all, or at least such that they're not currently putting existential pressure on the beetle. So has the service found that those other pressures are less? Yes, that's in the species status assessment. And they do say, again, all these findings, there's just much less data than we would like. All these findings are tentative to some extent, but the species status assessment did find that it appears that those pressures are no longer threatening the existing beetle population. But there's a new threat, which is climate change. There is a new threat, which is climate change, yes, your honor. But there are also threats about access to the right size of carrion. Yes, so that's that is the threat that the best hypothesis for why the beetle declined in the 20th century. But that that is the threat that at least for the... That it wasn't ameliorated. No, for the... So let's continue, climate change creates the same problems. Climate change can create, yeah. Competitive predators and things like that. And so that in fact, that is still a real issue for them. It is a real issue tied to climate change. Ameliorate, I know, but like climate change now, not climate change in 2039. No, your honor, that... Let me just finish.  I thought the finding was that now, at the time of the rule, that there is already climate change underway. And that causes carrion to decay and break down sooner. So they may not have access to it. It causes other species to get in, flies, lames, larvae, which ruins it for them. So that in fact, there was a continued problem, maybe a different cause of the problem. But a continued serious problem about their ability to get access to the carrion, which is absolutely vital to reproduction at the time of the rule. So the service did not make that finding, your honor. The service did acknowledge that climate change could affect carrion availability, but the service only found... Did they find it was affecting? No, I don't believe that they did. I think the service only found that... It's certainly affecting them in the Red River, Red Rock, whatever that area is. So in the Red River area, the issue is that atmospheric temperatures are at a threshold that the beetle can't tolerate. And that may also be affecting soil moisture. It may also be affecting carrion, but the service found for all effects of climate change, that they're only going to impact the... Become a threat to the beetle once temperatures reach that approximately 95 degree Fahrenheit threshold for average summer daytime temperatures. The other question I have is, again, there's been some talk about five-year periods or whatever. It seems to me that once they hit... Let's assume it doesn't happen until 2038, 39. They get to low and zero resiliency. That's not in danger of extinction. That is extincting. That is dying off. It seems to me the statutory language about in danger of extinction means your protections have to kick in sooner than when you're at low to zero. Because at that point, they're dying. They don't have their habitat. Those temperatures are not sustainable. And there's nothing the Fish and Wildlife Service can do to change the temperatures. And so why doesn't the... I guess there's a foreseeable future, which I think is often talked about in the rule as the mid-century period, the 20 to 2069. So why isn't the 2010 or 2020 to 2039, the near future, where we want to ask, are they in danger of extinction within this time period? Not actually becoming extinct, but in danger of those conditions appearing. Is that what in danger of is itself a before extinction time period, correct? I agree with your honor. Extinction isn't a minute in time. It's a process. Yes. So we need to have a period before the process. Correct? And they're in danger. That's what it was before when you listen to them as extinct. Yes. Sorry, my words. When they were listed as endangered previously, it wasn't that they were dying off that very minute. It was that they were in a process, or they were headed towards a process of becoming extinct. So what do you say, I mean, your client, what is the relevant window for in danger of extinction when your near term time period on these charts, not your mid-century, your near term one, shows them bottoming out in that time period? So I think the relevant time when they become in danger is when temperatures rise to a level at which it puts pressure on the beetle. Not to the level at which the beetle can no longer survive, but the near. So the service looked at two temperature thresholds. 95 is sort of the this is too much. And I think it's 93 to 94 is that this is a point at which it puts pressure on the beetle. And so that's the point at which the engagement happens. Not when they're all gone. And the other thing I would find out is that there is a period of time over which it's not like the temperatures hit 95 and all the beetles die the next day. Some will be more resilient. Some will not. There will be a period during which the position isn't that. They will only be threatened until we get to those 95 degree temperatures and the load is zero resiliency. No, they will be endangered. Before that, because they're in danger when we see that train coming around the bed. Right? So I don't think they're in danger when we see the train coming around the bed. I think they're endangered in the services view. The train squashing over them. No, when you get to the point that it starts to put pressure on the beetle. And what the service found. Where is the finding of when, not when we're going to be in this very dangerous death zone, which will be the actual extinction process. Where did they say that danger period, in danger of that happening will start? So the danger period is when the near threshold temperatures are reached and the findings. Near threshold, because this chart resiliency already has moderate and high emissions. I assume that includes climate change. Yes. And so that's the death zone.  So where is the before we get to that? So they're going to be in danger of extinction before we get to that. Maybe when they're in the 90s, when they're high 80s. So I think the endanger of extinction threshold is the low resiliency categorization, not the zero resiliency. And that is what. But low resiliency is something that could happen. You just weren't sure which it would be. But even under your low resiliency, you've got low, low, low. I mean, both of these columns, whether you've got you've got two options here, the RCP 4.5 and 8.5. And in both of them, they are bottomed out to low, low, low and zero. Yes. By 2039, the service expects that in the southern plains. By 2039. By 2039. That's the best that the service. No later than 2039. No later than 2039. We're in this bottom out period. And so the service had to exercise its judgment based on how it understood the climate modeling and how it understood the other threats of the beetle to the beetle, I should say, to determine whether. There was enough time between 2021 when they found the condition of the beetle to be good in 2039, sort of the end point at which they think the condition of the beetle is likely to decline to the point at which it may be endangered. Okay. I'm sorry. I thought you said. That when they hit this low to zero. We're beyond in danger of extinction. We are dying off. No, that's incorrect. Low, low, low resiliency would be in danger of extinction, even at zero resiliency. There are it is possible for a population at zero resiliency to persist for many, many years. It's just at that point that they are very susceptible to any shock. Low resiliency would definitely not be a point at which we would necessarily expect the species to inevitably go extinct. One way to think about it, I mean, there's all kinds of metaphors that come to mind, the train coming around the bend. I mean, it depends on how far the bend away, how big the train. I mean, there's lots of things that can vary the variations at which we view this. But one way to think about the statute is when a species is endangered, as opposed to already extinct. And extinction may be a process, but it's still at some point it becomes inevitable that the species is going to die off. But at another point, it's that it's really, really on the precipice of getting to that zone of inevitability, even if it hasn't all the way gone down. But there's things we can do that can attempt to forestall that.  And so the way I've kind of just thought about endangerment at a high level of generality is endangerment as opposed to extinction means that we better do some serious stuff because we've only got a limited amount of time. There's only certain limited things we can do. Let's try these things because they might work. Threatened means we're not quite at that point yet. We're somewhere anterior to that. But endangerment still means that there are still measures that can be productively done with the hope that they can succeed or to be on hopelessness, even if it's yet to happen. And so is your idea that if it's in, if we're in low in terms of resilience, that that's still a station at which things can be done, measures can be taken that can still hope to have constructive effects for starting up the species so that it can survive, even though we're in a red flashing light warning zone about the path to extinction? Yes, your honor, I would agree with that. And I would say, also, we've been talking a lot about the Southern Plains and understandably so, but I think stepping back a little bit and talking about what can be done. So there isn't a lot that the service can do to maintain populations in the Southern Plains by the end of the century. Climate change is pretty inevitable. The service is doing things to try to preserve the species, mostly by trying to establish new populations in areas that are more climate resilient. And the service continues to do that since the down listing. That's not something that depends on the beetle being endangered, nor is it something that would be compelled by an endangerment finding. These are affirmative actions that the service takes to try to preserve the beetle. But extinction includes dying off in a significant portion of habitat, and that is the Southern Plains analysis area. And so if you were saying, the service has already said, there is nothing we can do to save this off in the Southern Plains analysis area, a significant portion of habitat, as you agreed, then you're already past the point where there's measures that can be taken there. The fact that you might plant some in Missouri or a few more in Black Island does not save you from this species being in danger of extinction because it's going to lose a significant portion of its habitat in the Southern Plains analysis area. I think you just said that they are already in danger of extinction. It may not happen for a few years, but we're at the point where they're dying, they're going to die off, and there's nothing we can do about it in that area. No, Your Honor, because we don't think that's how the statute works. We think that what matters is not the time of extinction, but the time of endangerment. And the services finding in the 2021 rule is that for at least 20 years that there's not a risk of extinction to the beetle in the Southern Plains area. But necessarily, because of the way the definition of threatened is, there has to be some likelihood of future extinction. It's been 20 years from 2021. 18 years. There's some ambiguity about whether it's 2039 or 2040. We're putting that to the side. Let's say 2039, so I'm taking them at their word. 2039 is what they get. Anyway, not important. If it doesn't matter, then it doesn't matter. It's been 20 years. And there's nothing that can be done, is what you just said. We're going to have to plant them somewhere else. But the definition of endangered does not depend on the timing of the extinction. There could be endangered species now that may never go extinct. It depends on the threats that face the species now and the threats that may face the species in the future. We don't just look at the species at large. We have to look at it in a significant portion of its habitat. So let's pretend the only place this thing exists is the Southern Plains right now. Yes, Your Honor. And what the service found was that until 2039, that the beetle in the Southern Plains is not... No, it's more than 2039. The beetle that by 2039, which is the word they used by, that temperatures in the Southern Plains will not be such that they put the beetle at substantial risk of extinction, or really any risk of extinction, because the beetle was thriving in the Southern Plains as of 2021. And the service predicts that condition to endure for some period of time. Thriving? What does thriving mean? Is it exploding in population? It's not exploding. It's healthy. Maintaining? It's maintaining. Because of the beetle's annual life cycle, it's hard. The data here only go back to the 80s. In some of these places, it doesn't even go back that far because the beetle's annual life cycle causes population to fluctuate quite a bit from year to year. I thought you were born each year. That's how you would know thriving. Well, no, because it's going to go up and down. It's going to go up and down over time. It doesn't have to be thriving for you to... But yes, it doesn't have to be thriving. The point is that the service found that as of 2021, there was low risk of near-term extinction in the Southern Plains as well as in any other analysis area. And that's what the definition... And near-term is what? Near-term is within the time at which the service can reevaluate the status of the beetle. Is near-term the same as in danger of? I think that's probably right because the term that the service has used and was used in the polar bear litigation and the listing of the polar bear threat, which this court upheld, was the idea was that the species had to be on the brink of extinction. Meaning there was some imminent threat that the species could become extinct in the near future. Again, it's going to depend a little bit on the species, right? I don't understand that because you said things can be endangered even if they're going to be around forever. So let me give you an example, Your Honor. Let me give you an example. The North Atlantic right whale, extremely critically endangered. It could go extinct very soon. It may never go extinct. Because the threats facing that whale are different from the threats facing the beetle. There's no inevitability to the extinction of the North Atlantic right whale. But there is a severe risk that if, again, to Judge Srinivasan's point, if measures aren't taken, that the whale could go extinct because of its critically low numbers. Every species is different. That's why... So it's extinct within a year or two? Probably not within a year or two, but within a relatively short time. But again, it depends on the species life cycle, right? Because beetles are an annual species. You could have 20 generations in 20 years. The whale lives decades. But if you get to a point where there are only 100 non-reproductive whales left in the world, the species may persist for 100 years because the whale has long lived. That doesn't make it less endangered now. These things are necessary, and I understand it's frustrating, but they're necessarily species-dependent. I really do appreciate that. It just seems to me the fact that it only lives for a year means that actually the risk of catastrophic loss is very close. You don't really have long time periods. You have longer time periods to study the whale. Because if you figure it out, you're going to have whales still living for a while, but you can then encourage reproduction and do whatever you need to do on that front. But if it were next summer, and you suddenly had these temperatures not once, not twice, but for a month, you could lose almost the entire species in the Southern Plains Analysis Area. Because they get one shot at reproduction, and if a large percentage are wiped out and are unable to reproduce, that's it. I take your Honor's point, but I think it cuts both ways, right? So, yes, a catastrophic event in one year in an annual species like the beetle could be more catastrophic. At the same time, the annual life cycle of the beetle gives it more opportunities to rebound from catastrophic events that are not... Because it has many generations. It doesn't have many generations. They only last a year. Again, let me use my whale example to illustrate what I'm saying. If you kill off... If a quarter of the right whale population were to die in a given year, it would take many years, decades perhaps, for that population to rebuild, a percentage like that. If a quarter of the beetle population were to die off in a given year, because of the annual reproductive cycle, they could build that back up much more quickly. So it cuts both ways. Yes, on the one hand, it makes them more vulnerable to an annual catastrophic event in some ways, absolutely. But it also gives them more opportunities to bounce back from that. Again, I don't... I'm not a scientist, Your Honor. I don't want to get over my skis. The point I'm trying to make... You're doing better than I am on the science. These are really hard calls that the service has to make based on fairly uncertain science. They know climate change is happening, but when? The when is a little iffy. And that's why the court should defer, as the Supreme Court has held repeatedly, to the informed scientific expertise of the service, its policy judgment. Can I just follow up with one more question? Because you talked about this sort of five-year study review cycle. How does that cycle work? Does that mean you start in year one? I guess you started it last year. I think that I'm sure it went out last January. Do we have results from the study by 29 and then need a few more years to do a new rule? Is that a time period for doing this study? And imagine... Hypothesize that it says, yikes, we're going to be hitting that temperature mark in 2030. Does that time period allow you to both do the study and make the rulemaking in time to protect them from those results? Or is it study for five years, rulemaking, litigation, all that kind of stuff for another three or four years, at which point everything's too late? How much are you backing into that? So the study is not going to go on for five years. The service currently projects that the five-year review will be done in 2026, and the service could immediately propose a new rule. The other thing I would point out is the service doesn't have to wait for the five-year review to be done if the service has information that would cause it to think that an uplisting sooner is appropriate. For that matter, any person who has information that would suggest that the CC should be uplisted could petition the service at any time, and then the ESA statutory deadlines for acting on that kick in. So the five-year period is both the study and response period, if one's warranted? Yes. I think basically the service waits a few years and then does the study, which does not take five years to do. It takes a year to two years to do. Thank you. So for the beetle, I think we have agreement that low to zero resiliency would be endangered. I think that that is very likely correct. Why is it not arbitrary and capricious given that this record says that it will be low to zero by 2039, but we don't know when? It could be soon. It could be late. It could be anywhere in that range. And for the service to say that we don't see that endangerment now just because right this minute we're not there yet without explaining why. Because what you're relying on is today we're moderate, high, and low. Sometime between now and 2039, we will be for sure endangered. And so without explaining why, why can the service just say, and I think the words are, we're not worried about this until the mid-century. We think that the impacts will be in the mid-century when that's not what the data supports. The data supports it will be sometime between now and 2039, but then there's a disconnect where the service says the impacts are going to be felt in the mid-century. So I think, Your Honor, that if you review the portion of the species status assessment on the climate modeling, it discusses how the modeling was done in 30-year averages. And while the service cannot predict the certainty of a given year when those thresholds are going to be reached, and reached consistently over time. The service does, I don't have a site. I apologize for this, say that what matters is not reaching those temperatures in some year, but reaching them consistently over time for putting the species at risk. But I think that the service's analysis, fairly read, suggests that the service thinks that those temperatures are not going to be reached consistently until towards the end of that 30-year period of time. I'd really like to see where you have that in the record. And I think this court can uphold the service's less than ideal explanation as long as that can be fairly discerned from the record. And if the record does not reflect towards the end, does that change your argument? It doesn't change my argument if there's not a sentence in there that says towards the end. So that means it could be anywhere. No, I don't think you can fairly read either the species status assessment or the preamble to the final rule and come away with the conclusion that the service thinks it can be anywhere. Can I ask a question? So, for at least part of it, it's high. For the Arkansas River, it's high. Is there a scientific basis for thinking that in that area, it could be low next year? The year to the next year? I am not aware of such a basis. It's going to take some time. Yes. And the question is, we don't know exactly how much time. And then can you refresh my memory? I think you started again a second ago. A 30-year cycle, even that's – it just happens to be 30 years. So it happened in 2039 for reasons that you're going to – this is where my question is going. But even that one, we don't – there's just factors about the world that tell us that the best way to do the scientific analysis or the scientific analysis that exists, and you can answer that, takes it down to 2039 and then another 30-year cycle and then another 30-year cycle. Even that is not – I take it that the service isn't controlling the time duration of the analysis. It's just the conditions tell you that that's the time period in which an analysis can be made. So I think what the – 2039, in other words. Why are these arranged? Remind me. Sure. So the service found that the modeling could only be accurate over relatively long timeframes. And the service essentially thought to divide the 21st century into thirds, or what's remaining of the 21st century into thirds, that 30 years was enough time to be reasonably competent in the outcomes of the modeling that was available. And there's a degree of – I don't want to say the word arbitrary, but there's a degree of convenience in picking 30 because it divided the century into thirds. But it does need – the modeling did need to be done over a relatively long timescale for the service to have competence in the predictions. And then I think for – to pick up on the line of questions that Judge Pan has, it seems like the question is, if it's uncertain when in this timeframe that was picked for the reasons you just outlined, the population is going to go from high in one area, moderate in another area – it's already low in one, the smallest. It's going to go to low. Does that mean it's necessarily arbitrary now to classify the species as only threatened and not endangered? If we don't know – if we know that it's going to happen by the end of the period, we don't know exactly when it's going to happen. And let's just suppose in the – if there's a finding, if there's something in there that says it's more likely to happen towards the end of the period, all the better. But if there's not that, and you don't immediately know exactly where that would be, then where does that leave us in terms of whether it's arbitrary to say it's still only threatened and not endangered, even if we don't know exactly when we get to the point at which everybody would agree for present purposes it would be? Sure. So the service did point out in the preamble to the final rule that it believes that there will be adequate time between now and when temperatures rise sufficiently to put the beetle at risk to conduct another five-year review. And so I think if nothing else, that is a non-arbitrary reason for deciding that based on what the service knows about the beetle today and its status today in those areas and its prediction that it has at least five years before it has to – before temperatures are going to rise to a point to cause that risk, that that's a non-arbitrary reason for determining that it's threatened now. Ultimately, I think that's the issue. Did the service adequately explain why it thinks that the risk of extinction is only going to materialize in the future? And I think that that is sufficiently laid out in the preamble to the final rule. If I could, Your Honor, just talk for a second about remedy, unless there are other questions on the substance. I think you're asking what he said. Sorry. So the strangeness of the 30-year period here is that they started it at 2010, not the date of the rule. So by the date of the rule, you're already close to halfway through that time period. And if the findings are by 2039, not that we'll have an issue, but under both scenarios, the lower and the higher scenario, the majority of the Southern Plains analysis area is expected to be near or exceed the summer mean. So it's across time of 95, with potential to extirpate beetles from most or all of the Southern Plains population. That's the finding. What you've found is that by the end of this first time period, sometime before the end of 2039, the service expects these temperatures to already have been reached, which has, for scientific reasons, explained the potential to extirpate the American varying beetle from the entire Southern Plains analysis area. That sounds to me like a finding that in this time period, which we're already halfway through, close to halfway through at the time of the rule, we expect this thing, at the end of this story in this short-term period, is extirpation, or at least a substantial risk of extirpation, of the beetle in the entire, in 59% of its remaining habitat. Why is that not a finding? Because they're in danger of extinction now on the service's own record. It did not find, even if you're by 2039, which means to me no later than 2039, especially given this finding. They found there's a significant scientific risk, or a substantial enough risk for us to acknowledge, that it'll be extirpated in the Southern Plains analysis area by then. Why doesn't that mean they're in danger right now? So I don't think that's what the service found, Your Honor.  I know you're quoting, but let me explain what I think that that means, Your Honor. I think what that means is that by 2039 temperatures, the near-threshold temperatures, those are temperatures at which the beetle would be expected to survive, to be under stress. What the service found, the service found... Not near temperatures. The temperature in the Southern Plains is expected to be near or exceed maximum, maximum threshold temperatures, 95 degrees Fahrenheit. Right. It's the near that I'm talking about, Your Honor. And so if you look... Near or exceed. If you look at the species status assessment, I would encourage you to... But near would be in danger of. Even under your theory, near would be in danger of. Yes, near would be in danger of. And what I've been trying, I think, to say is that I think the service, I think based on these findings, probably the service thinks the beetle will be endangered by 2039, but 2039 is still far in the future. And what the ESA says is... It's not that far in the future from 2021. I know, but it depends on who you are. If you're a beetle, it's your great, great, great, great, great, great, great grandchild. I don't think that's how we ask questions. Well, but the point is, is that you can't, I think, divine from the language of the Endangered Species Act when is too soon. I think that is a decision that's going to depend on every species, the threats that face that species. And I think that's a decision for science and policy judgment. But we're looking at the record here and the actual data about low to zero resiliency in the timeframe here. So I don't know that those general arguments you're making, but in this case, we are looking at the record. Yes, and what the record says is the beetle is not in danger of extinction now, but will be by 2039 in the Southern Plains. And that is the definition of a threatened species. Not in danger now, but likely to be in danger in the foreseeable future. When was this moderate high-low finding made? 2020. That's the Species Status Assessment, so I think that's 2020. Which the rule relied on in 2021, yeah. Does that matter for us? Yes, yes. So that ultimately, Your Honor, I think I will concede that at times the way the material is presented in the Species Status Assessment is not crystal clear. That's actually in the final rule. And it's also in the final rule. So you're saying they didn't mean what they said? No, what I'm saying is what they said, what I understand them to be saying, what I think the preamble to the final rule says, is that the beetle is not in the Southern Plains, is not now in danger of extinction. It's not now on the brink of extinction, but likely will be by 2039, if that is far enough in the future. Extirpated is between 2040 and 2069. It will reach temperatures at which it may become extirpated. The actual extirpation is projected for the mid-century timeframe. Is it in danger of extinction when the extirpation starts or before the extirpation starts? I mean, they're in danger of extinction when temperatures rise to a level. I can access that. Are you distinguishing extirpation and extinction? No. Okay, so if you found a scientific risk of extirpation. Yes, when the risk of extirpation begins, that is when they are in danger, when the risk of extirpation begins. And the risk of extirpation begins when temperatures... The risk is not when it's happening, or not even when it's expected to happen. You're at risk of that. Yes, and that is what the service found is likely to happen by 2039. The service found that once temperatures reach 95 around 2039, by 2039, that then there will be a process which may last many, many years for which the beetle will decline and ultimately by approximately 2069 be extirpated. The service did not find that it is likely that the beetle will be extirpated by 2039. Oh, no, no, I absolutely agree. There's not a finding that they will all be gone by 2039. I thought in danger of extinction would kick in long before that. Well, I don't know about long before that. It kicks in... This case is hard because of the sort of on-off switch for this particular species. The beetle is fine until temperatures hit 94, 95 degrees. Up until that point, the beetle is not in danger of extinction. Once it hits a little below that, when it's getting close to that 95-degree threshold, that's when it's in danger of extinction, and that's when the service found will happen by 2039. And I think reading the record fairly, the service found is going to happen near the end of the early century time period. And that is over a decade in the future. Do you think there are citations that say near the end, more likely 2039 than 2030? I will go back and look, Your Honor. I don't know if there are, but I don't think it's... It's hard to understand. Unless you think the service is just being irrational, it's hard to understand the service's reasoning any other way than by inferring from its explanation that temperature is not going to rise to that point. I think you could say that... I know you want to get your remedy thing. But given your sort of discussion about we've got five years to study it again, pretty good inference from that that this could be 2030 to 2029. And that is in the final rule. Yeah, I don't have the page citation. It was in response to one of the comments. But the service specifically mentioned that there's enough time to revive itself. Right, but that means this risk is much sooner. If you had, and I'm not saying this is here. I haven't seen this here. But if you had a window of time and you had a service finding that said the nature of the species, the nature of the threats it faces, at some point in this 20 or 30 year window, and we don't know where within that window, could be soon, could be middle, could be later, it will be at risk of extirpation. If that were the services finding, you're saying it's not, you're saying that it's, if you read it as a whole, it goes further to the end. But if you actually had an agency of... Could they then still call it threatened or would they at that point have to call it endangered? I think at that point they probably would call it endangered because the way the species... It could be soon, middle, later. Yes, it could be imminent. It doesn't mean it will happen soon. It means that there's a risk of it happening. Imminence is the test for endangering? Yes. The word the service uses is on the brink, but I think imminence is a good way of thinking about it. They were finding it was imminent in 2008. In 2008, yes, because at the time the threats to the species were less well understood and they had these recently discovered populations. They knew the history of the decline of the beetle early in the 20th century. They were finding it was imminent. I'd have to go back and look at the 2008 assessment. But, yes, the conclusion of the service made was that the endangered listing should be retained in 2008. Because it was imminent or on the brink. Yes, it would necessarily. I don't know what language they used, but necessarily because that's how the service understands it. If they used that type of language, something of imminence, whether it was on the brink or imminence or immediately, would you let the court know? And if they didn't, I'm trying to understand how much brinksmanship we're playing with species here. I'm sorry. That was a long delay from your end. No, no. I want to be as helpful to the court as I can, Your Honor. Can I ask one factual question? Sure. If you can refresh my memory. You already reminded us that the Red River part of the Southern Plains is like a 15% share. As between Flint Hills and Arkansas River, do you remember what the breakdown is? I don't remember off the top of my head. Arkansas River is quite a bit smaller. I think it might be 20-some, but I don't know off the top of my head. Okay. So on remedy, Your Honors, if the court finds that the downlisting decision was not adequately explained, we would ask that the rule be remanded without failure. We think that the 40 rule adequately, more than adequately, preserves protections for the beetle that would remain in place in the interim while the rule were reconsidered. We think that reinstating the endangered listing would impose substantial costs on the service in terms of needing to process actions, particularly in the Southern Plains area, but throughout the area that would otherwise not require incidental take authorization from the service. We think that the service can, we think the science is there, and the service can more than adequately explain why the threat is not until the future. And given that the 40 rule adequately protects the beetle in the interim, we think remand without failure would be the most appropriate remedy here. Thank you, counsel. Thank you, Zach. I know it will be more than the usual time since we went over quite a bit and got into the merits, and you didn't have a chance, so we'll give you five minutes for a rebuttal. Thank you, Your Honor. You're free to use as much or as little of it as you'd like. Okay, thanks. In regards to this court's questions on the specific timeline of extinction here, the record states that there will be just a few remaining beetles in the Flint Hills analysis area at the end of 2039. And this is at JA473, where the service states for the Red River analysis area, climate change will make all habitats unsuitable by 2039. Those effects may already be occurring. In the Arkansas River analysis area, the service determined that, quote, potential extirpation for most or all of this analysis area is expected by 2039. That's at JA475. And then for the Flint Hills analysis area, the service determines that extirpation is expected by. Does that mean the extirpation is expected to be completed by? Yes. That's what I would read it at the very conservative read. And then for the Flint Hills analysis area, the service said a major decline in abundance for most all of this analysis area is expected by 2039. 32% of this analysis area is above threshold temperatures. Most of this remaining analysis area is at 94 degrees near threshold in 2039. And that is from JA475. The service, as you said, determined the maximum threshold temperatures at 94 and 95 degrees Fahrenheit for Southern Plains, and that's at JA468. So at the end of 2039, the entire Southern Plains analysis area will be at threshold temperatures in which beetles are no longer able to survive. Contrary to what we just heard from the government, American-bearing beetles may be able to survive periodic or occasional years at maximum thresholds at or above 95, but the average mean maximum temperature in 95 are not likely to support beetles that's at JA468. What we heard, so the government was arguing that right now the beetle is not extinct, and they were citing to the record at 413, which was the chart where the service did not consider climate change. That was the chart where the service was just considering land use changes in isolation. So your friend on the other side said that there's some place in the record where there was a finding or data that suggested that the bulk of the effects will be late in the timeframe between now and 2039. I never saw that, and I've read a lot of this record. Are you aware of that being anywhere? That is not in the record, Your Honor. The record indicates that by the end of 2039, there will be a few beetles. Yeah, 39. There will be very few beetles. And it keeps saying by 2039, by 2039. It never says late. No, it does not. But I think the more important part of this is that the service is conceding that the beetle will be extinct as soon as 2040, and there's no explanation for why extinction. No, I think what they're conceding is it'll be endangered, not extinct. The record states that the beetle will be extinct as soon as 2040. The record says it'll be very likely be extirpated by 2040, and that's at JA312. At the high emissions level, America is ‑‑ Wait, wait, wait, wait, wait. All right. Where are you on the page? I do not have the record in front of me, JA135. You're on JA312. That's the high emissions scenario underlined. Yes, it's the high emissions scenario. And the high emissions scenario, quote ‑‑ That's 2040, 2069. Right. So at ‑‑ So the high emissions scenario very closely represents current climate rate change and is a very realistic scenario. This is at JA483. Wait, wait, wait, wait. So should I not look at 312? I should look at 483? No, what I'm saying ‑‑ I just was responding to one of your guys' comments that that's a high emissions scenario, which is a very realistic scenario. So my point is that the service at JA132 concedes that ‑‑ 132 or 312? Sorry, 312 concedes that the American Bering Beetle will very likely be extirpated by 2040 to 2069. Elsewhere in the record, it indicates that by the end of 2029, there will just be a few lone survivors. By the end of when? 2039. When is that? So the record that I was just reading, the JA473, JA475, and JA475, which indicates that only a few beetles will remain in the Flint Hills analysis area at the end of 2039. I'm sorry, is that 473? This is a reading of 473 to 475. Would you be willing to send, because you were hopping around here a lot and using up a lot of your little time, to send in these citations in the letter? Absolutely, yeah. And then obviously the government can send in whatever it considers as most relevant. Yes. I have lots of tabs and highlights. Me too. I'm not able to go from 312 to 43 to make those connections as fast as you are. I think, though, what we did hear from the government is that they concede that if resiliency is low or zero at that time frame, that means endangerment. And that is what the service found, and that's most clearly represented at JA132. And so extinction at that time, in the time frame that the service found in the record, there is no explanation for why that scenario accurately fits in the threatened determination. The parties all agree that the species should be listed. And so the question is, should it be listed in threatened or should it be listed as endangered? It cannot be a threatened species because the species is not in danger of extinction in the foreseeable future. It is – excuse me, I misspoke. It cannot be a threatened species because the species is not likely to be endangered in the foreseeable future. But it can be an endangered species because the species is in danger of extinction now. So it's at least threatened. I mean, it's also threatened. It certainly can be threatened. It certainly can be threatened. Oh, no, no, no. It certainly cannot be threatened because it is not in danger of extinction. You're saying it's not in a likelihood zone or in a certain – They are not likely to become an endangered species in the foreseeable future. It is likely to become an extinct species in the foreseeable future. And that factual scenario fits better in the endangered definition because it is in danger of extinction now. What if – I mean, there's lots of findings here and things aren't looking good for the 2030s. Correct. But until then, until early – even, say, early 2030s, we're not going to be at the temperatures. We're not going to have the dying off. Why is it unreasonable to consider it in this timeframe to be threatened? Because these charts are the chart, but there's nothing in the threatened finding that says, and we refuse to reconsider this until 2039. I mean, they are going to look at it again during the 2020s. Why isn't that a reasonable approach? For a couple reasons, Your Honor. First, because that begs the question of how much decline is too much – or how much decline is enough to satisfy the services standard. Where we have a situation where they know that the very same threat that is – has currently extirpated the most southern portion of this analysis area is the very same threat that will extirpate the entire southern phase analysis area as soon as 15 years from now. And second, again, this notion that they can quickly return the American Bering beetle to an endangered species is illogical because of the reasons you suggest. It takes a long time. These processes, you know, they announced the five-year review over a year ago. It was due a few months ago. Also, it would require a new round of public comment. It would require probably petitioning the service by an organization to list the beetle as threatened or as endangered. And so the suggestion that there can be a rapid reclassification is just severely misleading. How long – so they looked again in 2008, right, and decided to continue listing it as endangered. How long was the time period from – they must have done a five-year study then. They did a five-year study. The time period between announcing the study and then making the decision in 2008 to continue to list it as endangered. What's that? Oh, the timeline between the 2005 study and the downlisting decision. Is that what you're asking? Sorry. The 2005 study, I assume, led to their decision in 2008 not to downlist, to keep it continued as endangered. Yeah. They went from three years from study to – No. And I misspoke when I said 2005. In 2008, they did a five-year review, and they just concluded that it should remain endangered. How long did that study take? I don't know how long that study took, Your Honor, but – That was the last one. That was the last one, which – It's a five-year review. Exactly. That review was not until they started this one. They started this last year sometime. They announced – It was the most recent one. They had another one before this. No. The only other five – I think the only assessment that's in the record here was – In 2019, the status assessment. When did it start? I don't know the answer to that question, but it started with a petition from the Oil and Gas – I think it was 2016. It's in – So, it's five years between petition and final rule. Correct. It was. So, I guess I'm back to my question, then. And then – If they've got time to do another look and study, which they've already started last year, they've got that time to do it and act before the late 20s. Why isn't that reasonable? It's not reasonably, Your Honor, because here we are in 2025, after years of the beetle fighting climate change. And so, even if the service does determine that the beetle should be listed as endangered now, it could be significantly more years towards a final rule, at which time the beetle may be extinct in the Southern Plains by the time that happens. And all the more reason to list now. And it's arbitrary. If the service is going to list the species in a five-year review next year, why not list it now? The record indicates that – They're going to do the study to see. They're doing the study to see whether, yikes, is climate change speeding up? Is 2039 – is it way worse than that? It really is more like 2029 or 2032 or whatever the science shows. Right. I mean, I know there's information out there about global warming, but I assume it's not going to jump from 2039 to 2026 when there's extirpation risk. No, that's – no. Based on the record here, it's likely that the five-year review will continue to say that the beetle is going to be extirpated in the near future. But this case, right now, in front of this court, the service cannot adequately explain why, right now, the beetle is not in danger of extinction. And it can't adequately explain why this scenario, extinction in the service's own foreseeable future timeframe, fits in the definition of threatened. Do you agree or disagree, what case law or rulemaking can you point us to, that endanger or imminent or immediate threat? There is no policy from the service that that is the definition of endangered. Your definition of endangered cannot match likelihood in the foreseeable future, so endangered has to be shorter term. Correct. What do you think the statute means when it says endangered? It means extirpated in the foreseeable future. Even if we take the service's definition. I focused on certainty rather than timeframe. Threatened is just likelihood. Maybe it wouldn't happen in the foreseeable future. And you're saying endangered or extinction is certainty in the foreseeable future. Yeah, we're saying both, Your Honor. No, how are you saying both? Because if both means temporal, then in the foreseeable future, is already in the definition of threatened. So if you have the same words for endangered as you do for threatened, then timeframe is not in it anymore because for both of them, it's in the foreseeable future. It seems like the distinction you're drawing is whether you're extinct or endangered. Is that the distinction you're drawing? I thought you were doing the distinction between certainty and likelihood, which is threatened and certainty of extinction or endangered. Yes, Your Honor. There is a certainty element in the definitions of endangered and threatened. And whereas here, we have a situation where the service itself said that it is very likely, as soon as 15 years from now, the species will be extinct. I just want to make sure I'm understood. I get the point that there's a difference in terms of likelihood of extinction. And I can't remember the exact words, but there's some gradation between threatened and endangered. But it didn't seem to me like you were drawing any distinction in terms of the timeframe because the words you used were in the foreseeable future, which is already the words in threat. So there's no difference between endangered and threatened. No, Your Honor. There is a difference between. What is that?  then endangered can't be in the foreseeable future because that's already in threat. Well, endangered, the Congress didn't define endangered as will be extinct. It didn't define endangered as extinction, and it didn't define endangered as will be extinct. It defined endangered as in danger of extinction. And so there is a forward-looking element of the endangered definition. It is less so than the threatened definition. But I think what's being asked here is, is that when you say it's less so than, I'm not sure which one you even said was less so, but threatened is less so than endangered, I guess. But there is a forward-looking timeframe. There is a forward-looking timeframe. What is that forward-looking timeframe? They say imminence on the brink. What do you say? You're asking me to put a number of years or. You wanted us to write an opinion that says what it means, that means what you want it to mean, but if you can't put it into words, I don't know. Yes, excuse me. I'm very interrupted. What we're asking this court to find is that in no scenario, do these facts fit into the definition of threat? It can fit into the definition of endangered and more accurately fits into that, but it cannot fit into the definition of threatened. Because? Because the species is going to be extinct very, very soon, in as soon as 15 years from now. In order to uphold the services threatened determination here, it would require a rewriting of the definition of threatened from a species that is likely to become an endangered species in the foreseeable future to a species that is likely to become an extinct species in the foreseeable future. And that not only ignores the. They would say, no, we're saying it's likely to become on the brink of extinction in the foreseeable future. You're saying done on in the foreseeable future, 2039. They're saying no likely to be in danger. Right on the brink of extinction by 2039. That just seems like scientific factual dispute. No, it's not your honor. At the end of 2039, there's only a few left. And so if we uphold this service, if this court upholds the services rationale here, which is to list the species as threatened when it knows extinction will occur as soon as 2040, that entirely contradicts the purpose of the Endangered Species Act, which is longer needs protection and to protect a endangered when there are just a few remaining population, or excuse me, few remaining individuals and entire populations contradicts the services duty to conserve and recover. Have any reason to believe that this beetle will be at that state before some point in the 2030s? Is this a fight about where in the 2030s decade? No, it's not your honor. The relevant facts, I think are that climate change has already extirpated the population in Texas and Arkansas. It will continue to escalate North resulting in the ultimate extirpation of the Southern Plains by 2040. And that is... You're not disputing that time. So I think what you're referring to at 475 is a quote that says with climate change, a major decline in abundance in most or all of this analysis area is expected by 2039. Right. And then if you read... There's a major decline by 2039. So if there's a major decline by 2039, why is it not endangered now? Yes. I think that's... Good question. And exactly our point. Why is it not in danger of extinction now? Yes. And it certainly can't be endangered in the foreseeable future or likely to become one because it is endangered now. And if this court continues to read that paragraph, it says in 2039, the temperatures across it will be 94 to 95, which doesn't support. And so, yes, there is no... We do not dispute the services finding that extinction will likely happen between 2040 and 2039. The question is whether or not extinction in that timeframe fits the definition of threatened. And it doesn't, but it does more accurately fit the definition of endangered. Oh, I see what you're saying. You're saying there will be actual extinction between 2039 and 2060. And so it can't be that they'll become threatened at that point. Yes. Or it can't become endangered at that point. Yes. Excuse me. Yes. But you're not... But it could. Go ahead. You run in. No. You're the boss. It could become endangered by 2039 and not yet still be endangered. That doesn't... Wait. Can you repeat that? The fact that it couldn't... The fact that it might become or will become extinct between 2040 and 2069 doesn't necessarily mean that it's already endangered now. Yes. It does mean that. It does mean that. Because, again, in addition to there being a certainty element, which is met here, there is a forward-looking element too. Sure. But of course there's a forward-looking element. But does that mean that any time that a species we can predict is going to become extinct, that it's necessarily endangered now, no matter what? Any time that the service with certainty knows that extinction is going to happen in a very short foreseeable... Excuse me. I'm not going to use the word foreseeable. In a very short timeframe. That means that it can't be a threat. That it's in danger now. Yes. And, or, it can't be a species that is likely to become one. Because extinction in 15 years from now is in danger of extinction now. And I see you're on a shift you're headed. Well, it's just... For one thing, I think you keep saying that it can't be that it's likely to become extinct. And I think what you mean to say, it can't be that it's only likely. What I mean to say is it can't be likely to become endangered. Because it is endangered now. Because it is going to be extinct very soon. And what do you mean by very soon? As soon as 15 years from now. And where are you getting 15 years as that? I don't know where very soon comes from because I don't know the statute. But what do you consider to be very soon? 15 years from now. You think that qualifies as very soon? That's just kind of your understanding. And that's the threshold you would use is very soon. At the very minimum. You mean 15 years from 2025 or 2021? From right now. 20 years from 2021. So 20 years is now very soon. For purposes of the ROOF tool. Because we're looking at 2021. Okay, so let's step outside of this plain language argument. And step entirely into the state farm territory. If we accept the services definition of endangered and threatened. At a very minimum. The service did not explain why. You know, the service found. That the beetle in the southern plains isn't endangered because the risk of extinction is in the near term. Well. There was never any explanation of why this scenario. Two decades from now is not near term. And. Under state farm and basic elements. Of APA. The service has to do that and they didn't do that here. And also the risk is not low. The record indicates that the risk is very likely that an extinction will occur. In the near term. And so. That is why I was. This. Explanation and decision is arbitrary. In addition to violating the plain language of the rule. Okay. Thank you, counsel. Thank you to both counsel. We'll take this case under submission and we'll. Wait for your follow-up letters.
judges: Srinivasan; Millett; Pan